1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

THE UNITED STATES OF AMERICA,

Plaintiff,

vs.

DAVID MEDNANSKY, MARTINE MEDNANSKY, individually,

Defendant.

CASE NO. 10cv1307-LAB (BGS)

**ORDER GRANTING PARTIAL SUMMARY JUDGMENT**

[Docket No. 6.]

On June 30, 2010, the United States filed a motion styled as a motion for summary judgment (the "Motion"). In fact, the Motion does not seek complete adjudication of all issues; rather, it asks the Court to issue an order of ejectment and find the Mednanskys are liable for damages, but to leave the issue of the amount of damages to a later time. The Motion did not specifically seek dismissal of the Mednanskys' counterclaims, though it appears these will be moot if the motion is granted. The Motion is therefore a motion for partial summary judgment. *See* Fed. R. Civ. P. 56(a).

After several continuances, and an order granting the Mednanskys' relief from their failure to file an opposition, the Motion is now fully briefed. At the time the Mednanskys failed to oppose the Motion, the hearing was vacated and the Motion deemed submitted on / / /

1    the papers.   The Court has reviewed the briefing and has determined no hearing is
2    necessary on this Motion.   *See* Civil Local Rule 7.1(d)(1).

3    **I.     Background**

4         The Mednanskys occupy a cabin located on Lot 7 of the Pine Creek Tract in the
5    Cleveland National Forest.  They previously had a permit from the U.S. Forest Service.  They
6    acquired their permit and bought the cabin in 1999, but the permit expired December 31,
7    2008 and, in spite of extensions of time in which to seek renewal, has not been permanently
8    renewed.[1]

9         The Mednanskys and employees of the United States were parties to two earlier
10   related actions for alleged civil rights violations.   The first, *Mednansky v. Gillett*,
11   07cv1425-LAB (CAB), was dismissed on the merits.  The Ninth Circuit found the appeal to
12   be frivolous, denied leave to proceed *in forma pauperis*, and summarily affirmed.
13   *Mednansky v. Metz*, 09cv1478-LAB (BGS), which was dismissed in part with prejudice and
14   in part without prejudice, is now on appeal.  The order of dismissal is *Mednansky v. Metz*,
15   2010 WL 3418376 (S.D.Cal., Aug. 26, 2010).  The Ninth Circuit docket for this case shows
16   nothing has been filed in the docket and no action has been taken since the appeal was
17   docketed on September 27, 2010.  In *Mednansky v. Metz*, the Mednanskys sought relief
18   from the U.S. Forest Service's refusal to renew their permit, because of unresolved disputes
19   concerning conditions on the property.

20        In this action, the United States seeks an order ejecting the Mednanskys from the lot,
21   an order compelling cleanup and reclamation of the property, an order enjoining the
22   Mednanskys from using the property further, and an award of damages for the Mednanskys'
23   alleged trespass on the lot.

24   / / /

25

26   [1]  *See* Opp'n to Motion, Ex. 44 (email dated June 2, 2009 from Mr. Mednansky to
     William Metz).  The letter in this exhibit discusses Metz's purported agreement that old
27   permit would be carried over one more year (*i.e.*, until December 31, 2009) on the same
     terms, and that terms of a new permit after that remained to be worked out.  This apparently
28   refers to a form letter the Forest Service sent to holders of expiring permits, which is
     discussed below.  In *Mednansky v. Metz*, the Court found that form letter didn't constitute
     a contract.  But even if it did, even that agreement expired over a year ago.

## II.    Legal Standards

Federal Rule of Civil Procedure 56(c) empowers the Court to enter summary judgment.  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.  Civ. P. 56(c); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).  A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v.  Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  "Factual disputes that are irrelevant or unnecessary [are] not counted." *Id*.

The movant has the initial burden of demonstrating that there is no issue of material fact and that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Arpin*, 261 F.3d at 919.  If the movant met his or her burden, the burden then shifts to the non-movant to show that summary judgment is not appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 324 (1986).

In considering the motion, the non-movant's evidence is to be believed and all justifiable inferences are to be drawn in his or her favor. *Anderson*, 477 U.S. at 255.  In this case, the United States  is the moving party seeking summary adjudication of its claim for relief.  As the party with the burden of persuasion at trial, the United States must establish "beyond controversy every essential element of its . . . claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quoting W. Schwarzer, California Practice Guide: Federal Civil Procedure Before Trial § 14:124–127 (2001)).  If a rational trier of fact could find in the Mednanskys' favor on these claims, summary judgment will be denied.

Inadmissible evidence is not considered when ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Services, Inc*., 854 F.2d 1179, 1181–82 (9th Cir. 1988).  Nor may a party resist summary judgment by relying on mere allegations or denials of the moving party's evidence. *Anderson*, 477 U.S. at 248.

**III.    Eviction Claim**

There is no dispute that the special use permit under which the Mednanskys were permitted to occupy the lot has expired,[2] and that they are still occupying the cabin on that lot.  Under the permit, the Mednanskys were required to pay an annual fee, to be determined by assessments.  A copy of the permit is attached as Exhibit 1 to the Motion.  The Mednanskys rely on this document as well, and don't question its authenticity.  They agree they signed this permit and that it constitutes a contract (*see* Opp'n to Motion, 1:6 (describing the permit as "a binding contract")), but argue that they are not bound by all its terms, and were not in violation of the terms they consider valid.  In their counterclaim they seek its renewal for a term of 20 years, and other relief to help them continue occupying the property.

The Mednanskys' defenses focus on whether the United States, through its officials, was right to refuse to renew the permit.

**A.    Whether All Terms of the Permit Are Binding**

**1.    The Alleged Oral Agreement**

The Mednanskys argue that in 1999, they discussed with a U.S. Forest Service representative Rich Tobin what the terms of the permit would be.  They argue that this constituted a valid oral agreement.  (Opp'n to Motion, 3:16–17; 21:10–20.)  The evidence submitted in support of this argument consists of Mr. Mednansky's declaration (*Id.*, Document number 26-2.)  The Mednanskys also point to a complaint letter written by Mr. Mednansky in January, 2001 saying what he thought Tobin had told him.  (Opp'n, 3:17–22 (citing Ex. 6).)

The Mednanskys allege they closed escrow, relying solely on Tobin's representations in reaching their decision to buy the cabin from its previous private owners.  (*Id.*, 3:22–24.)

---

[2] In earlier litigation, the special use permit wasn't submitted to the Court, and the Court accepted the Mednanskys' representation that they had leased the property for 20 years.  *See Mednansky v. U.S.D.A. Forest Service Employees*, 2008 WL 4482498 at *1 (S.D.Cal., Sept. 30, 2008).  Pleadings from both parties in *Mednansky v. Metz* and this action confirm that the Mednanskys actually held a special use permit and that its terms provided that it would expire on December 31, 2008.  Apparently what the Mednanskys mean by "20 year permit" is that even though the special use permit expired at the end of 2008, it could be renewed for another 20 years.  (*See* Opp'n, ¶ 27 ("On December 5, 2008, Defendants contacted [Metz] . . . regarding renewal of their 20-year permit."))

1   They argue that they didn't receive the written permit until March, 2000, although they

2   requested it repeatedly.  (*Id.*, 4:1–2.)  When they examined it, they allege they saw it

3   contained terms contrary to what Tobin had represented.  (*Id.*, 4:2–4.)  They say they

4   protested to Tobin, but signed the permit anyway, believing that if they did not, they would

5   lose their investment. (*Id.*, 4:4–7.)   They now argue that they are not bound by terms in the

6   permit that conflict with what Tobin told them.

7        Mr. Mednansky's declaration identifies only one specific representation made by

8   Tobin, pertaining to whether the cabin could be used as a full-time residence.  (Document

9   number 26-2, ¶ 1.)  Other than this, he just mentions "representations regarding the terms

10  of the Special Use Permit" without saying what those representations were.  (*Id.*)  Even

11  assuming the written permit could be modified by an earlier oral agreement, this vague

12  declaration doesn't create a triable issue of fact about the terms of that agreement, or even

13  whether there was such an agreement.

14       The letter says Tobin gave them reason to believe the lot wouldn't be inspected more

15  than once per year, and they would be allowed to use the cabin as their full-time residence,

16  as long as they had another residence available to them. The letter isn't admissible as

17  evidence against the Forest Service, but even if it were, it undercuts the Mednanskys'

18  argument.  It says Tobin told Mr. Mednansky over the phone there wasn't a "rule book . . . for

19  the buyers of the cabins,"[3] and that Mednansky "was verbally, over the phone, given the

20  rules governing ownership." (Opp'n, Ex. 6.)  The rules, the letter says, were "very informal

21  and essentially minimal in content."  (*Id.*)  It also mentions "various repairs and upgrades"

22  to the cabin that Tobin allegedly told Mr. Mednansky he would be able to do.  (*Id.*)  These

23  repairs and upgrades are unidentified, but it is clear they didn't include replacing destroyed

24  buildings (a point Mr. Mednansky later disputed).  (*Id.*)  This account contradicts the

25  ──────────────

26  [3] The letter goes on to say Mr. Mednansky later found out there was a rule book, and
    Tobin sent him some photocopied pages from it on February 10, 2000.  It's not clear what

27  this rule book was.  The Opposition's Exhibit 1 consists of an inspection report dated
    December 14, 1999, and some typewritten pages from a booklet are attached, so this may

28  be what the letter refers to.  But those pages just include general advice and guidance,
    accompanied by graphic illustrations, and they identify themselves as "guidelines."  (Ex. 1
    at 8.)  They don't purport to constitute part of a contract.

1  Mednanskys' current position that they thought at the time they had entered into an oral

2  contract with Tobin.

3       Furthermore, accepting Mr. Mednansky's report as true, and assuming such a

4  contract were  even enforceable, important elements of contract formation are missing, such

5  as a manifestation of mutual assent, and consideration or an exchange of promises.  *See*

6  Restatement (Second) Contracts, §§ 17, 18; *Steinberg v. United States*, 90 Fed.Cl. 435, 444

7  (Fed. Cl. 2009).  Though the Mednanskys allege they considered Tobin's representations

8  to constitute a binding oral contract (Opp'n, 3:16–17), their belief doesn't make it so.  *See*

9  *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1110 (C.D.Cal., 2009) (declining

10  to accept "legal conclusions cast as factual allegations" (citing *Bell Atlantic v. Twombly*, 550

11  U.S. 544, 127 S.Ct. 1955, 1965 (2007))).

12       There is also no evidence that Ms. Mednansky was a party to this conversation.  Mr.

13  Mednansky describes it as a conversation between himself and Tobin.  Although the

14  Opposition references Ms. Mednansky's "declaration," no such declaration is attached.

15  Rather, what appears to be intended as her declaration is a typewritten, unsigned, undated,

16  and unattested-to timeline of events bearing a title saying they were prepared for the benefit

17  of Ms. Mednansky's psychologist.  The timeline is written in summary and conclusory fashion

18  (*e.g.*, "Verbal contract led us to believe we will have privacy and independence (only once

19  a year inspection) as well as an acceptable level of rules, regulations, and risks.") (Opp'n,

20  Document number 26-1 at 1.)  Though the Mednanskys have also attached a copy of Ms.

21  Mednansky's psychological diagnosis, there is no showing this timeline was submitted for

22  that diagnosis, and it is inadmissible if offered by the Mednanskys.  Most of the remarks give

23  no indication whether they were based on Ms. Mednansky's personal knowledge.  To the

24  degree it might be admissible under Fed. R. Evid. 803(4) if foundation were provided, it only

25  serves to show Ms. Mednansky's perceptions, not the legal assertions embodied in it.

26       Even if the conversation with Tobin had created an oral contract, the signing of a new,

27  conflicting written agreement would have effectively repudiated that agreement.  The law

28  doesn't  countenance  the  reformation  or  partial  rescission  theory  suggested  by  the

Mednanskys.  Even if the Mednanskys thought they had an oral contract with the Forest Service in 1999, they knew as of no later than March 1, 2000 (the date they signed the written permit) that the Forest Service had repudiated that agreement and presented them with a new one.  Their remedy, assuming they had one, would have been, within the limitations period, to sue the Forest Service in the U.S. Court of Claims for breach of contract,[4] or to sue Tobin for misrepresenting facts or violating his duty to them in other ways.[5]  The course of action they chose — signing the new agreement, accepting benefits under it, and only years later, after it expired, challenging its validity — did not preserve any rights they may have had.

Even assuming an oral agreement of the type the Mednanskys allege could modify the later written agreement, or be enforceable against the United States, no such contract existed.  There is no triable issue of fact on this point.

### 2.   Duress

The Mednanskys also argue they didn't consent to the written permit at all, because they signed under duress.  But what the Mednanskys have described was not duress.  The factual allegations don't show Tobin intended for them to close escrow without having seen the terms of the permit.  That they did so, and then found themselves in a predicament afterwards, does not amount to coercion or duress.  There are no allegations, much less

---

[4] Had they brought such a claim, the Forest Service could have raised defenses such as the statute of frauds or parol evidence rule.  The Forest Service might also have produced the testimony of Tobin concerning what he said.  And the Forest Service might also have pointed out Martine Mednansky wasn't a party to that conversation.  Even assuming these oral remarks constituted a valid contract for a long-term interest in land, the Forest Service anticipatorily breached that contract by presenting the Mednanskys with a new written agreement, and making clear the oral agreement with contradictory terms would not be honored.

[5] The Mednanskys argue Tobin had a duty to fully inform them of the terms of the permit before they bought the improvements, and to hold a conference attended by the Mednanskys, the Forest Service, and the prospective sellers.  (Opp'n, 21:14–20 (citing Forest Service Manual's discussion of responsibility of its personnel towards permit applicants); Ex. 6 (letter of January 18, 2001 complaining that Tobin hadn't held a meeting between the seller, potential buyer, and Forest Service representative to explain rules governing ownership and use of the property).)  It is not clear this is true.  Under Section VII.D of the current permit, for example, the seller (not the Forest Service) is responsible for providing prospective buyers with a copy of the special use permit before finalizing the sale.

1  evidence, that Tobin pressured the Mednanskys to sign the permit.  And even if there were

2  duress, it would merely render the contract voidable by prompt disaffirmance, not void and

3  subject to challenge years later.  *Barnette v. Wells Fargo Nevada Nat'l Bank of S.F.*, 270

4  U.S. 438, 444 (1926).

5       The United States points out another fundamental problem with this argument, which

6  is that the permit either is a binding agreement or it isn't.  If the permit was never validly

7  entered into, the Mednanskys never had a valid agreement and have been in trespass since

8  2000.  What is more, they could not now enforce its terms, as they attempt to do elsewhere

9  in their Opposition.

10      **B.    Expiration of the Permit Term**

11      Even if the Mednanskys' legal arguments about the permit's real terms were correct,

12  the permit by its own terms expired on December 31, 2008.  (Motion, Ex. 1 at 2, § I.3.)  The

13  Mednanskys have presented no evidence they were told it had a longer term,[6] or would

14  expire upon the occurrence of some other event.  It is undisputed the Mednanskys knew

15  they were only entitled to use the cabin until December 31, 2008 under the terms of the

16  permit, and they haven't shown that any earlier agreement or reasonable interpretation of

17  the permit would require a longer term.  And in any event, when they signed the permit on

18  March 1, 2000, they knew it would expire at the end of 2008.

19      **C.    Whether the Mednanskys Had an Enforceable Right to Renewal**

20      The permit in fact makes clear it might not be renewed after it expired.  (Mot., Ex. 1

21  at 6–7, § IX, "Issuance of a New Permit.")  For example, issuance of a new permit requires

22  a "determination of consistency with the Forest Land and Resource Management Plan" and

23  the new permit is required to include "terms, conditions, and special stipulations that reflect

24  new requirements imposed by current Federal and State land use plans, laws, regulations,

25  _____

26      [6] The Mednanskys represent Tobin told them they "qualified" for a 20-year Special
   Use Permit.  (Opp'n at 3:15–16.)  Even if this representation constituted evidence, they
27  haven't alleged or argued Tobin promised they would get such a permit, or that it would
   remain in force for 20 years with no other conditions attached.  Furthermore, the
28  Mednanskys' own exhibits from that time, while they raise many other complaints, don't
   mention any objection to the permit's term. (*See, e.g.*, Opp'n, Ex. 6.)

or other management decisions." (*Id.*, § IX.A and B.)  Specifically, the permit requires a project analysis of the property in order to determine whether the lot can continue to be used as a recreation residence. (*Id.*, § IX.A.2.a.)  The Mednanskys' own evidence makes clear Forest Service employees reviewed the property and told them changes would need to be made before a new permit could be issued.  The Mednanskys don't dispute that they rejected the Forest Service's new conditions; instead, they argue the Forest Service's conditions were unreasonable.

### 1.  Reasonableness of Denial of Renewal

The Mednanskys rely in part on the Forest Service Manual and Handbook.  The Manual and Handbook, however, are not federal regulations, and do not have the force of law. *Western Radio Servs Co., Inc. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996).  They do not bind the agency and litigants cannot rely on them when litigating against the Forest Service. *Forest Guardians v. Animal & Plant Health Inspection Serv.*, 309 F.3d 1141, 1143 (9th Cir. 2002); *see also Thompson v. Smith*, 2008 WL 1734495, *4 n.1 (E.D.Cal., Apr. 11, 2008) (citing cases where agency manuals were held not to confer substantive rights and were not binding on the government).  Rather, they serve as guidelines for the Forest Service in its exercise of discretion. *Western Radio*, 79 F.3d at 901.  And because the Forest Service was allowed to base its decision on a variety of factors, including the broad "other management decisions," a showing that the decision was in tension with guidelines in the handbook or manual wouldn't help the Mednanskys.

The Mednanskys also argue the Forest Service made an unreasonable decision based on the facts.  This argument was the subject of litigation in the related *Mednansky v. Metz*, and was analyzed there, where the Court found Forest Service officials were entitled to qualified immunity because their decisions and actions weren't unreasonable.  The Mednanskys now bring new evidence they didn't submit in the related case, in an effort to relitigate the question of whether the denial was reasonable.

/ / /

/ / /

## a.   Previously Considered Facts

The Court's analysis of the facts and law is largely the same as in the earlier case. *See* 2010 WL 3418376 at *1–*2.  These are repeated only briefly here.

On November 20, 2008, Ranger Owen Martin sent a notice of noncompliance telling the Mednanskys they needed to obtain a new recreation residence permit.[7]  It identified violations of the special use permit's terms and conditions:

1.   An unauthorized rock wall on each side of the cabin[8]

2.   A vehicle stored next to the garage

3.   An unauthorized outhouse

4.   Unauthorized construction of footings, filled with cement and rebar

5.   An unauthorized shed

6.   A rope or chain improperly attached to trees.

The letter pointed out the first four violations had been identified during the previous year's inspections.  It directed the Mednanskys to correct all the conditions and call to initiate a reinspection.  Assuming all identified violations were corrected, the letter said a new 20 year recreation residence special use permit would be issued.   The letter also told the Mednanskys, if they could not meet the deadline but were working in good faith to comply, that they could be issued a one-year permit provided they submitted a compliance plan.

The Mednanskys did not directly dispute any of the identified violations until June 2, 2009, when Mr. Mednansky sent Metz a letter.  Mr. Mednansky didn't dispute the existence

---

[7] The Opposition alleges the Mednanskys never received this notice.  (Opp'n, 16:20–21 ("Defendants were not aware of the November 20, 2008 notice issued by Owen Martin and it was not posted on Defendants' door.") (citing Declaration of David Mednansky).)  This apparently means the Mednanskys didn't receive the last notice of noncompliance until after June 1, 2009.  (Opp'n, 16:18–20 (discussing dates of notices).)  But it is clear they received a copy on June 1, 2009, to which Mr. Mednansky responded in a detailed email the next day.  The Mednanskys attached copies of both documents to their complaint in *Mednansky v. Metz*, and have attached a copy of the notice of noncompliance to their Opposition.  (*Id.*, Ex. 21.)  And it is likewise clear they had received similar notices in 2004, 2005, 2006, and 2007.  (Opp'n, 15:23–16:14.)

[8] The Mednanskys maintained this was actually stacked building stone, awaiting use in a construction project they had hoped the Forest Service would approve.  Photographs submitted by the Mednanskys in this case show rock is still piled up on the property in a wall-like formation.  (Opp'n, Ex. 48 (Document 26-9) at 26.)  The United States' photographs of the property confirm the rocks are stacked like a wall.  (Motion, Ex. 20.)

1   of these conditions, except for the parked vehicle.  Rather, he argued the Forest Service's
2   identification of them as violations was wrong, and nothing needed to be changed.  The
3   parties agree the Mednanskys never worked with the Forest Service to develop a
4   compliance plan, and still haven't made the changes the Forest Service told them were
5   needed.

6       As detailed in the Court's order of dismissal in *Mednansky v. Metz*, *see* 2010 WL
7   3418376 at *3–*5, this interchange was followed by negotiations and communications
8   between the Forest Service and Mr. Mednansky.  The Forest Service altered its view
9   somewhat, mitigating its request for removal of the vehicle and outhouse, and agreeing to
10  short-term permit extensions if the Mednanskys would begin to bring the property into
11  compliance with the Forest Service's requirements.  Citing the unreasonableness of the
12  compliance demands, the Mednanskys rebuffed the Forest Service's offers.  In the end, the
13  permit was not renewed.

14      As the Court found in *Mednansky v. Metz*, Forest Service officials' determinations,
15  even assuming they were wrong, weren't unreasonable.  The same is true here, even
16  considering all the Mednanskys' evidence.  The Mednanskys don't dispute that building
17  materials are stacked on the property; that foundations have been dug and poured, covering
18  the rebar footings intended for a building never authorized; that they replaced a shed without
19  prior approval; or that an old, disused outhouse on the property has not been removed.
20  (Opp'n, 1:13–2:6; 15:23–4 (citing Plaintiffs' Exs. 6–17).)  Rather, they argue these are
21  allowed under the permit.

22      As an administrative agency, the Forest Service is entitled to deference in interpreting
23  and applying its own regulations and standards.  *See Chevron, U.S.A. v. Natural Resources*
24  *Defense Council, Inc.*, 467 U.S. 837, 844 (1984).[9]  In particular, the Forest Service is entitled
25  to deference when making decisions about the renewal of special use permits.  *Ness*

26

27      [9] To be clear, the Court is not deferring to the Forest Service's policies.  *See Sacora*
28  *v. Thomas*, 628 F.3d 1059, 1066 (9th Cir. 2010) (holding that agency's internal policies were
    entitled to a measure of deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944),
    rather than full *Chevron* deference).  Here, the Forest Service is interpreting and applying
    applying duly adopted regulations, not merely its own policies.

1  *Investment Corp. v. U.S. Dept. of Agriculture, Forest Serv.*, 512 F.2d 706, 716 (9th Cir. 1975)

2  ("The federal courts have no such expertise, nor . . . do the courts have any standards by

3  which acceptance or rejection of a particular applicant could be tested . . . . Congress did not

4  intend for the federal courts to redetermine the question.") (citing *Hi-Ridge Lumber Co. v.*

5  *United States*, 443 F.2d 452 (9th Cir. 1971)).

6      By way of example, the Forest Service has expertise to determine whether the

7  Mednanskys should be allowed to construct or expand buildings on the property, should be

8  prohibited from keeping building materials stacked on the property, or should be required to

9  remove a tree deemed unsafe.  Under the permit, and under law, the Forest Service has

10  discretion to decide these matters.  This Court lacks both expertise and any manageable

11  standards under which to review such decisions.  In circumstances such as this, the Court

12  is not permitted to second-guess the Forest Service's determinations about how national

13  forest land should best be managed.  Agency decisions may be reviewable under

14  appropriate statutes, but any decision with a rational basis will normally be upheld.  *See*

15  *Skranak v. Castenada*, 425 F.3d 1213, 1219 (9th Cir. 2005).

16      The Court adopts the same reasoning as it did in its order of dismissal in *Mednansky*

17  *v. Metz*, at least as applied to the evidence it has already considered.  In *Metz*, the Court was

18  deciding the issue of qualified immunity, and held that even if the Forest Service's

19  determinations were erroneous, they weren't unreasonable.  2010 WL 3418376 at *9.

20          **b.    New Evidence**

21      The Mednanskys never argued the non-renewal of their permit violated a statute or

22  regulation, only that it was based on factual mistakes or malice.[10]  Much of the evidence the

23  Mednanskys submit pertains to the strained relationship and various conflicts between them

24  and the Forest Service or other government agencies or officers concerning access to the

25  property or the Mednanskys' use of national forest lands. Some of these issues are newly

26  presented but most were litigated in the two earlier actions. That evidence isn't relevant to

27  

28          [10] In *Mednansky v. Metz*, the Mednanskys did argue Forest Service officials were
acting in retaliation for protected First Amendment activities.  But this claim was dismissed,
in part, because renewal was denied months before the alleged motive for retaliation ever
arose.

show whether the Mednanskys were in violation of the terms of the permit, or whether the Forest Service was acting within its discretion by not renewing the permit.  The Mednanskys have also submitted evidence in an attempt to show various disputes decided in *Mednansky v. Gillett* should have been decided differently.  As noted, that case is now final.  Those issues are therefore not subject to relitigation here.

The Mednanskys point to evidence that in February, 2000, they submitted plans for an addition to their cabin, and that Tobin assured the plan would be approved and that they were authorized to have building materials delivered to the property.[11]  (Opp'n at 4, ¶ 3 (citing exhibits); *see also id.* at 15:7–9 ("Piles of rock and sand to be used when construction authorized.") (quoting 2002 inspection report).)  The Mednanskys say they were surprised upon seeing the written copy of the special use permit on March 1, 2000 that something more than an oral approval was needed.[12]  (*Id.*, ¶ 4.)  Among other things, the U.S. Fish and Wildlife Service had to conduct  a biological assessment and give its approval.  (*Id.*)  After much administrative wrangling, the project was not approved.[13]  (*Id.*, ¶¶ 4–6.)  The Mednanskys contend they are still awaiting approval, but this is an unreasonable expectation in light of the Forest Service's many communications over the years telling them the footings, foundation, and building materials could not stay.

This evidence doesn't help the Mednanskys.  The Forest Service didn't tell the Mednanskys they were in violation because they had building materials delivered to the property in 2000.  Rather, the violation it identified was that they hadn't removed the materials long after it was clear the construction wouldn't be approved.  And even accepting the Mednanskys' allegations, they at most had been told the construction would be approved

---

[11] Other evidence submitted by the Mednanskys contradicts their declaration that Tobin had already approved the construction.  (*See, e.g.*, Ex. 6 (letter of January 18, 2001 from Mr. Mednansky to Nelson Dean) ("I informed you that I had requested approval to undertake construction activities from Rich Tobin but had not heard from him for 6 months."))

[12] Section III of the permit requires approval both by an authorized officer and a licensed professional approved by the Forest Service.

[13] The Mednanskys also maintain it was never denied, either.  (Opp'n, ¶ 6.)  That said, dealings between the Mednanskys and the Forest Service in the interim have made clear the project was not going to be approved.

1   in the future.  They knew they hadn't yet been given approval to begin construction on

2   anything, such as by installing the footings, pouring a foundation, or building a new shed.

3        The Mednanskys also proffer evidence that they didn't receive conciliatory letters from

4   the Forest Service offering them more time and opportunities to come into compliance.

5   (Opp'n, 17:3–5.)  If they didn't receive these, however, the reason was that they had decided

6   in September, 2006 to refuse all mail from the Forest Service except for permit fee invoices.[14]

7   (*Id.*, 16:14–17.)  The Mednanskys apparently intend this evidence to help their case, but in

8   fact it has quite the opposite effect: It shows they knew the Forest Service regarded them

9   as being out of compliance, and deliberately avoided opportunities to come into compliance

10  or reach any other arrangement with the Forest Service.  The fact that the Mednanskys told

11  the Forest Service they didn't want any to receive more mail (Motion, Ex. 9) makes no

12  difference; they are not entitled to forbid the Forest Service from using any reasonable and

13  legal means of communication.

14       The Mednanskys also point to evidence that other permit holders nearby committed

15  similar violations, without encountering obstacles to renewal.  (Opp'n, 2:15–17.)  They offer

16  this to show the identified violations weren't really violations, but were a pretext.  The cited

17  evidence, however, consists of photographs of cabins and other improvements, some with

18  annotations.  The annotations make vague accusations such as "He stack[s] building

19  materials around and I think they are still there."  (Opp'n, Ex. 49 (Document 26-10 at 9).)

20  Other photographs point out nearby permittees have sheds, garage apartments, or fences.

21  This is irrelevant without some kind of showing that those improvements weren't authorized,

22  that the violations are as longstanding as the Mednanskys', and that they pose the same risk

23  the Mednanskys' do.  Some photographs show vehicles parked outside, but even assuming

24  the vehicles are parked there frequently or permanently, they don't appear to be inoperable

25  / / /

26  _____

27  [14] The Mednanskys say they decided on this course of action because they thought
    the Forest Service was retaliating against them for the Mednanskys' complaints about an
    incident litigated in *Mednansky v Gillett*.  They concluded that if the letters were accepted,

28  Ms. Mednansky would suffer anxiety and depression. (Opp'n, 16:15–17.) They don't explain
    why Mr. Mednansky couldn't have opened them instead, or why the Mednanskys couldn't
    have enlisted someone else to read and respond to the notices for them.

1   or otherwise troublesome.  Furthermore, none of the photographs show multiple violations

2   as identified on the Mednanskys' lot.

3          As part of the same argument, the Mednanskys also cite a 1990 study showing

4   violations had occurred in national forests across the United States.  Even if that were

5   admissible, it isn't pertinent because it doesn't show that permit holders across the nation

6   were similarly situated to the Mednanskys.  It also doesn't show what actions were taken to

7   remedy the violations.

8          The Mednanskys say Tobin told them that although the cabins were intended as

9   recreational residences, most of the cabin owners used them as full-time residences.  (Decl.

10  of David Mednansky, ¶ 1.)  They say Tobin told them the Forest Service allowed this so long

11  as the owners had another place available to them, such as a room in a friend's home.

12  Section I.C of the permit provides that the cabin was only to be used for recreational

13  purposes  and not as  a principal  place of residence,  and that  using it as such  would be

14  grounds for revocation of the permit.  But even if the Court were to accept Tobin's alleged

15  remarks as binding, the Mednanskys didn't even comply with that lenient reading of the

16  permit's terms.  According the Mednanskys, they lost their only other residence (a boat), and

17  have nowhere else to live except the cabin.  (Opp'n 23:5–11.)

18         The Mednanskys point to earlier inspection reports purportedly showing the inspectors

19  had no concern with certain conditions.  There is no reason for believing these inspection

20  checklists would constitute a permanent finding or a "plan" as contemplated under Section

21  II of the permit, but even if they did, there is no basis for concluding the Forest Service

22  couldn't alter its judgment or that conditions couldn't change.  That same permit section

23  expressly provides that the plan is to be reviewed and updated annually, taking into account

24  the obvious fact that conditions change.  Under Section IX of the permit, renewal after

25  expiration  also requires  new determinations  by the Forest Service,  and requires

26  consideration of changes in the Forest Service's judgment and plans.

27         The Mednanskys also keep a chain barrier, often secured by a lock, across the road

28  to their cabin.  (Decl. of David Mednansky,  ¶ 7.)  The November, 2008 notice tells them

1   "Remove lock from chain gate across road to cabin immediately.  Forest Service must have

2   access to area at all times.  (See Special Use Permit Section III Clause A.)"[15]  (Opp'n, Ex.

3   21.)  This issue wasn't litigated in *Mednansky v. Metz*, but has been raised here.  The Forest

4   Service's position is that, while chain barriers are (or were) allowed in order to deter

5   unauthorized parking in driveways, locking the chain would prevent needed access to deal

6   with natural disasters or fire hazards.  (De Sonia Decl. (Docket number 6-3), ¶ 8.)  Mr.

7   Mednansky's declaration says the chain is there to deter unauthorized use of the driveway

8   or access to the cabin by criminals. (Decl. of David Mednansky, ¶ 7.)  He says it merely

9   creates a "visual deterrent" and is removable, even though it is locked, since "authorized

10  persons can navigate under or around the chain and the posts holding the chain are easily

11  removed because they are not firmly secured in the ground."  (*Id*.)  This evidence doesn't

12  alter the Court's analysis.  The Forest Service's conclusion that the locked chain improperly

13  blocks the driveway and creates a hazard is still reasonable and entitled to deference.

14  **2.   Contractual Obligation to Renew Permit**

15          The only other possible basis on which the Forest Service could be required to renew

16  the permit is a contractual obligation to do so.

17  **a.   Whether the Permit Requires Renewal**

18          The Mednanskys argue there is a triable issue of fact as to whether the refusal of the

19  Forest Service to renew the permit constitutes a breach of the permit itself.  This argument

20  fails because, in the absence of ambiguities, agreements such as the permit are construed

21  as a matter of law.  *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 951, n.21 (9th Cir.

22  2002).  There are no ambiguities here to resolve.

23          The Mednanskys focus on Section IX.A.1 of the permit, which provides that "[w]here

24  continued use is consistent with the Forest plan, the authorized officer shall issue a new

25  permit, in accordance with applicable requirements for environmental documentation."

26  (emphasis added).  The remainder of the permit, however, defeats their argument.  Section

27

28          [15] This section of the permit provides that permission is required to build or maintain
any improvement not specifically named in the permit.  Examples include signs, fences,
mailboxes, name plates, and sheds.

IX.A provides that decisions to issue new permits "require a determination of consistency with the Forest Land and Resource Management Plan (Forest plan)."

Section IX.B provides:

> In issuing a new permit, the authorized officer shall include terms, conditions, and special stipulations that reflect new requirements imposed by current Federal and State land use plans, laws, regulations, or other management decisions. (36 CFR 251.64).

Here, the Forest Service has repeatedly tried to impose such requirements on the Mednanskys, which they have rejected at every turn. The permit's citation to the regulation is pertinent because, in addition, that regulation provides:

> When a special use authorization provides for renewal, the authorized officer shall renew it where such renewal is authorized by law, if the project or facility is still being used for the purpose(s) previously authorized <u>and is being operated and maintained in accordance with all the provisions of the authorization</u>.

36 C.F.R. § 251.64(a) (emphasis added). Because the Court must defer to the Forest Service's decision that the property isn't being maintained in accordance with the provisions of the permit, this regulation provides that it need not be renewed.

### b.    Other Written Communications

The Mednanskys have pointed to a form letter dated January 13, 2009 from Forest Supervisor William Metz with the salutation "Dear Recreation Residence Permit Holders." (Motion, Ex. 16; Opp'n, Ex. 37.) This letter apologized to recipients for the Forest Service's lateness in issuing permits, but assured them they wouldn't be penalized for the Forest Service's lateness. The letter assured recipients "you will have a legal authorization during this interim period." (*Id.*) It also told recipients, if they hadn't received a bill for fees, they would be receiving one shortly, and told them they would have 30 days to pay it. The letter added "We want to guarantee you that the Forest Service will continue to proceed with the execution of the new 2-year or short duration permits as well as the bills until completed."

The Mednanskys argue this was a binding contract to renew the permit. The United States presents evidence making the obvious point, that this was a form letter automatically sent out via a mailing list. (Motion, 8:20–22 (citing Metz Decl, ¶ 3).) The United States also

admits sending the letter to the Mednanskys was an oversight, since they were in non-compliance, and points out later correspondence with the Mednanskys made this clear. (*Id*., 8:22–9:1.)   While the salutation addresses "Permit Holders," the body of the letter makes clear it is addressed to holders of expired permits.   Although the Forest Service says it "want[s] to guarantee" to proceed with the issuance of 20-year and short-duration permits, it doesn't guarantee to issue either of those to the recipient.   Furthermore, the fact that this mentions two types of permits in the alternative makes clear recipients weren't guaranteed a 20-year permit as the Mednanskys now claim.

The Court ruled on this issue in *Mednansky v. Metz*, and its ruling here is the same. This was clearly a form letter.   Even accepting the Mednanskys' profession that they interpreted it as a promise to renew their permit for 20 more years, that belief was unreasonable and unfounded by the letter itself or the Mednanskys' course of dealings with the Forest Service.   The Mednanskys had already been sent letters addressed to them personally telling them their permit would not be renewed unless they met certain conditions, including submitting a plan to remedy the violations.   They knew they hadn't complied with those conditions, and knew their permit wasn't going to be renewed.   Furthermore, any promise represented by this letter would be gratuitous.

The Mednanskys have also submitted a postcard (Opp'n, Ex. 38) addressed "Dear Recreation Residence Permittee" and saying the bill for 2009 would be issued in January, 2009.   This card isn't even signed, and fares no better than the form letter.   In addition, it is postmarked December 19, 2008, when the Mednanskys' permit was still in force and could yet have been renewed if they had met the conditions.

In short, neither the letter nor the post card, nor the two together are enforceable as a contract to renew the permit.

**D.   Other Arguments**

A few remaining issues raised in the Mednanskys' opposition have not been discussed in earlier sections.

/ / /

The Mednanskys argue that because they invested a lot of effort in the cabin, they have a vested right to it. The Mednanskys' evidence shows they did a good deal of renovation and made repairs to the cabin. While this fact makes the Mednanskys' situation the more unfortunate, it doesn't provide any defense.

The Mednanskys' Opposition properly acknowledges that special use permits don't create vested property rights, however, and their appeal to state law is unavailing. (*See* Opp'n, 23:16–24:9.) The Mednanskys knew from the start, before they even saw the written permit, that they weren't buying the land and didn't have any permanent right of occupancy. They also clearly knew the permit would expire at some point. Furthermore, the renovations were, at least in large part, carried out after the Mednanskys had signed the permit. The permit makes clear that it might not be renewed, and that it might be terminated, even if the Mednanskys kept up their end of the bargain. While the Mednanskys may have hoped this would be their permanent home, they knew it might not be.

The Mednanskys also rely on the form letter, post card, and other correspondence to raise an estoppel defense. Their argument, essentially, is that they were misled into believing the permit would be renewed even though they hadn't corrected the identified violations. The Opposition points to an alleged failed delivery of a notice in September, 2006, arguing that the Mednanskys never heard anything about the permit not being renewed, that Metz had assured them it would be renewed, and that they certainly would have complied with the Forest Service's requirements if only they had heard about them in time.[16] (Opp'n, 22:15–3 ("They had no knowledge of the intent of the Forest Service to refuse renewal of the permit.")) The Mednanskys also point to correspondence with Metz concerning appraisals, which were to form a basis for new fees, from which they apparently inferred the appraisal was the only obstacle to permit renewal.

This argument is frivolous. It is unsupported by any evidence; in fact, it is demonstrably false, even by the Mednanskys' own selective evidence. Notices of non-

---

[16] The Opposition has selected June 1, 2009 as the relevant "point of no return," even though the Mednanskys were actually given until June 26 to submit a plan to correct the violations.

1    compliance had been issued annually since 2004, identifying violations on the property and

2    citing the permit's "revocation for cause" provision.  (Opp'n, Exs. 21, 30.)  On December 5,

3    2008, the Mednanskys sent Metz an email telling him to send "legitimate correspondence

4    for Term Permit administration with us directly from your office," indicating they were

5    unhappy some type of term permit letter had been sent or delivered by Descanso district

6    staff.  (*Id*., Ex. 35.)  This argument also directly contradicts the Mednanskys' own position

7    in *Mednansky v. Metz*.  (*See, e.g.,* Case 09cv1478, Complaint, Ex. A (email from Mr.

8    Mednansky to Metz, upbraiding Metz for a letter of May 12, 2009 threatening "seizure" of the

9    Mednanskys' home and property if they didn't agree to new permit terms).)  And finally, even

10   accepting, *arguendo*, that the Mednanskys had no idea until June 2, 2009 the violations on

11   the property would result in non-renewal of the permit, they were given even more time after

12   that to submit a plan to bring the property into compliance (Motion, Ex. 17, 19), and refused.

13   (*Id*., Ex. 18.)

14         Correspondence from Mr. Mednansky to Metz asking when the permit would be

15   renewed and expressing disbelief on hearing it had expired are inadmissible hearsay if

16   offered by the Mednanskys to prove they genuinely hadn't heard.  *See* Fed. R. Evid. 803(3)

17   (statement of belief inadmissible to prove truth of matter believed).  Any claim of surprise or

18   ambush is omitted from Mr. Mednansky's declaration, which merely says "We did not

19   observe a note Dated November 20, 2008 posted on our door on or around December 1,

20   2008."  (Decl. of David Mednansky, ¶ 10.)

21         In short, it is beyond question the Mednanskys knew the Forest Service considered

22   them in violation of the terms of the permit; they were given extensions of time and ample

23   opportunity; and even then they refused to take the initial step of submitting a compliance

24   plan.  They have no estoppel or any other equitable defense.

25         **E.    Conclusion: Eviction Claim**

26         Though the Mednanskys raise a number of disputes, they are either not material or

27   not factual disputes, and this claim can be decided as a matter of law.  Undisputed facts

28   show the permit expired December 31, 2008.  Arguably, the Mednanskys were given leave

to remain on the property longer, possibly as late as June 26, 2009. But it is beyond argument that extension of time has also expired. Even though the Mednanskys have argued the conditions on their property aren't violations, or aren't serious violations, the Forest Service's determination that they are is entitled to deference. There is no evidence this was an unreasonable or irrational determination.

With that issue decided, it is clear the Forest Service was not required under law or under the terms of the permit to renew the permit. Because the Mednanskys' permit has expired and they are not entitled to renewal, they are not entitled to occupy the cabin or the property. Under section X.A of the permit, at the end of the term of occupancy, or on abandonment of the property, the permittee is obligated to remove all structures and improvements from the property within a "reasonable time" (not to exceed 180 days from the date the authorization of occupancy is ended). Under this same provision, if the permittee fails to remove the improvements, they become property of the United States and the permittee is liable for the cost of their removal and restoration of the lot. The United States has expressed its intention to restore the property to its natural state.

The United States has met its initial burden of showing that there are no genuine issues of material fact, and it is entitled to judgment as a matter of law. The burden therefore shifts to the Mednanskys to point to specific facts showing there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322. The Mednanskys have raised various arguments based on a purported contract and equitable doctrines. But their arguments about the meaning of the permit, about the existence or effect of other purported agreements, or about the law, are not "specific facts," and their allegations don't constitute evidence. The evidence they have submitted either hurts their case, or is irrelevant. They have therefore presented no evidence to show there is a genuine issue for trial. Because it is clear the Mednanskys are not entitled to continue occupying the property, and are trespassing, the United States is entitled to evict them.

/ / /

/ / /

**IV.   The Mednanskys' Liability**

The United States has sought summary judgment on the issue of damages for trespass, and for recovery of the cost of returning the property to its natural state.  The Mednanskys were never sent a bill (which would imply permission to occupy the property), and therefore haven't paid a fee to occupy the property since the end of 2008.  The United States asks for an award of a reasonable rental rate plus interest and administrative penalties in amounts to be determined at trial.  The United States concedes the cost of removing improvements cannot be determined until removal is complete.

While it is clear the Mednanskys are liable for trespass, in this case damages are not appropriately determined at the summary judgment stage.  And while it is clear the Mednanskys will be liable for the cost of returning the property to its natural state, there is no way to determine at this time what that amount is.  Under Section X.A of the permit, the time for removal of structures or other improvements from the property has already passed, so it is unclear whether the Mednanskys will make arrangements for this now, or will elect to simply vacate and pay the costs of removal as provided under the same section.  Furthermore, issues that weren't briefed in the summary judgment motion — such as the previous condition of the lot — may have some bearing on the cost.

Although the complaint alleges the Mednanskys have been in trespass since December 31, 2008, they have a reasonable argument this date was extended at least until June 26, 2009.  This, too, is not amenable to resolution on the pleadings.

Finally, the United States has asked for an award to compensate it for the cost of recovering possession of the property.  The issue of whether the United States is entitled to such a recovery has not been adequately briefed.  And in any event, until that is accomplished, there is no way to determine that amount.

**V.   Conclusion and Order**

The United States' motion for partial summary judgment is **GRANTED IN PART**.  The United States' claim for eviction of the Mednanskys from Lot 7 of the Pine Creek Tract of the

/ / /

1  Cleveland National Forest is **GRANTED**.  To the extent the United States seeks any

2  payments, the motion is **DENIED**, and these amounts remain to be determined later.

3  Counsel for the United State is directed to lodge, no later than March 18, 2011, in

4  editable electronic format, a proposed order or orders granting the relief sought in the

5  Complaint in connection with the claim for eviction.  *See* Electronic Case Filing

6  Administrative Policies and Procedures Manual, § 2(h). These proposed orders may include

7  an order requiring the Mednanskys to vacate the property within 30 days from the date of

8  issue, a writ of execution, and an order enjoining the Mednanskys and those acting in

9  concert with them from occupying the property.  The orders may be combined as

10  appropriate.  The same day, the United States must file in the docket a notice attaching the

11  proposed orders as exhibits.  The Mednanskys' counsel may file in the docket any objections

12  to the proposed orders no later than two court days after the notice attaching such orders

13  is posted.  Objections are not to include requests for reconsideration of this ruling.

14  Because it appears the Mednanskys' counterclaims may now be moot, they are

15  **ORDERED TO SHOW CAUSE** by filing a memorandum of points and authorities, not

16  exceeding fifteen pages, no later than **May 16, 2011**.  The page limit does not include any

17  attached or lodged material.  The United States, if it wishes, may file a reply subject to the

18  same page limits no later than May 16, 2011.  *See Council of Ins. Agents & Brokers v.*

19  *Molasky-Arman*, 522 F.3d 925, 933 (9th Cir. 2008) ("[W]e have an independent obligation

20  to address whether a case is moot because it goes to the Article III jurisdiction of this court.")

21  (citation omitted).  If the Mednanskys fail to show cause within the time permitted, their

22  counterclaims will be dismissed for lack of jurisdiction.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1    If the parties wish to discuss settlement of the remaining issues, such as removal of
2  the structures or amount of fees or other payments, they are directed to contact the
3  chambers of Magistrate Bernard Skomal.

4       **IT IS SO ORDERED**.

5  DATED:  March 8, 2011

6

7                                    _Larry A. Burns_

8                                    **HONORABLE LARRY ALAN BURNS**
                                     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28